No. 13-16248

_____

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

_____

ARIZONA DREAM ACT COALITION; JESUS CASTRO-MARTINEZ;
CHRISTIAN JACOBO; ALEJANDRA LOPEZ; ARIEL MARTINEZ; AND
NATALIA PEREZ-GALLEGOS,

Plaintiffs-Appellants,

v.

JANICE K. BREWER, Governor of the State of Arizona, in her official capacity;
JOHN S. HALIKOWSKI, Director of the Arizona Department of Transportation,
in his official capacity; and STACEY K. STANTON, Assistant Director of the
Motor Vehicle Division of the Arizona Department of Transportation, in her
official capacity,

Defendants-Appellees.

_____

On Appeal from the United States District Court for the District of Arizona,
No. 2:12-cv-02546-DGC

_____

## ANSWERING BRIEF OF APPELLEES
## GOVERNOR JANICE K. BREWER, JOHN S. HALIKOWSKI
## AND STACEY K. STANTON

_____

Douglas C. Northup
Timothy Berg
Sean T. Hood
FENNEMORE CRAIG, P.C.
2394 E. Camelback Road, Suite 600
Phoenix, Arizona 85016-3429
Telephone: (602) 916-5000
Email:  dnorthup@fclaw.com
Email:  tberg@fclaw.com
Email:  shood@fclaw.com
Attorneys for Defendants-Appellees
Governor Janice K. Brewer,
John S. Halikowski and Stacey K. Stanton

Joseph Sciarrotta, Jr.
Office of Governor Janice K. Brewer
1700 West Washington St., 9th Floor
Phoenix, Arizona  85012-2913
Telephone:  (602) 542-1586
Email:  jsciarrotta@az.gov

Co-Counsel for Defendant-Appellee
Governor Janice K. Brewer

# TABLE OF CONTENTS

**PAGE**

TABLE OF CONTENTS.................................................................... i

TABLE OF AUTHORITIES ............................................................ iv

INTRODUCTION ...........................................................................1

JURISDICTIONAL STATEMENT ...................................................3

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW ...........3

STANDARD OF REVIEW ..............................................................4

STATEMENT OF THE CASE ..........................................................4

STATEMENT OF FACTS ................................................................6

    I.      Deferred Action As A Form Of Agency Prosecutorial Discretion. ........................................................6

    II.     The Deferred Action for Childhood Arrivals Program. .......................7

    III.   ADOT Determines that DACA Recipients Are Not Entitled to an Arizona Driver's License. .................................9

    IV.   Governor Brewer Issues Executive Order 2012-06 Reaffirming Arizona's Stated Intent to Limit Access to Public Benefits............... 12

    V.    Plaintiffs Allege Irreparable Harm and Seek a Preliminary Injunction of the Executive Order and ADOT Policy........................ 13

    VI.   The District Court Permits Limited Discovery on Plaintiffs' Alleged Irreparable Injury................................................. 14

    VII.  The District Court Dismisses Plaintiffs' Supremacy Clause Claim and Denies Plaintiffs' Motion for Preliminary Injunction. ..... 16

SUMMARY OF THE ARGUMENT ................................................. 18

i

ARGUMENT ................................................................................... 21

I.  PLAINTIFFS SEEK A MANDATORY INJUNCTION, REQUIRING
    THEM TO MEET A HEIGHTENED STANDARD OF PROOF. ............. 21

II. THE DISTRICT COURT ACTED WELL WITHIN ITS
    DISCRETION IN FINDING THAT PLAINTIFFS HAVE NOT
    ESTABLISHED IRREPARABLE HARM. ................................................. 23

    A.  Plaintiffs' Allegations of Constitutional Violations Do Not
        Create a Presumption of Irreparable Harm. ....................................... 24

    B.  Plaintiffs' Own Testimony Establishes that They Have Not
        Suffered Any Harms Related to Employment, Family Relations,
        and Everyday Activities. ................................................................... 27

    C.  The Record Does Not Support Plaintiffs' Contention that They
        Have Suffered Stigmatic and Psychological Harm. ........................... 31

    D.  The District Court Properly Excluded Evidence of Harm from
        Potential Prosecution of Driving Without a License. ........................ 34

    E.  ADAC Has Not Independently Established Irreparable Harm. ......... 37

III. THE DISTRICT COURT ACTED WELL WITHIN ITS
     DISCRETION IN FINDING THAT THE BALANCE OF EQUITIES
     AND PUBLIC INTEREST DO NOT FAVOR AN INJUNCTION. ........... 39

IV.  PLAINTIFFS' CONFLICT PREEMPTION CLAIM FAILS AS A
     MATTER OF LAW BECAUSE THE ADOT POLICY DOES NOT
     CONFLICT WITH FEDERAL IMMIGRATION LAW. .......................... 42

    A.  ADOT Has Not Defined Authorized Presence in a Manner that
        Conflicts with Federal Law. ............................................................. 43

        1.  USCIS's Pronouncements Confirm that DACA
            Recipients Do Not Accrue Authorized Presence in the
            United States, Other than for the Calculation of Future
            Inadmissibility. ......................................................................... 45

2. A Congressional Research Service Memorandum Confirms That, Notwithstanding Any Authorized Presence For Admissibility Purposes, DACA Recipients Are Otherwise Unlawfully Present and Not Authorized to Reside in the United States. ................................................. 47

B. The ADOT Policy Does Not Conflict with Congress and Federal Law. ........................................................................ 48

C. The ADOT Policy Does Not Undermine the Federal Government's Determination that DACA Recipients Be Permitted to Work. .................................................................. 50

V. PLAINTIFFS' CONSTITUTIONAL PREEMPTION CLAIM FAILS BECAUSE THE ADOT POLICY NEITHER REGULATES IMMIGRATION NOR CREATES IMMIGRATION CLASSIFICATIONS. ..................................................................... 52

CONCLUSION ...................................................................................... 57

STATEMENT OF RELATED CASES ................................................. 59

CERTIFICATE OF COMPLIANCE ..................................................... 60

CERTIFICATE OF SERVICE ............................................................. 61

# TABLE OF AUTHORITIES

**PAGES**

## CASES

*Ariz. Contractors Ass'n, Inc. v. Napolitano*, Nos. CV07-1355, CV07-1684, 2007 WL 4570303 (D. Ariz. Dec. 21, 2007)..........................................50

*Arizona v. United States*, 132 S. Ct. 2492 (2012)...........................................49, 52

*Bazuaye v. INS*, 79 F.3d 118 (9th Cir. 1996) ...........................................34

*Caribbean Marine Servs. Co., Inc. v. Baldrige*, 844 F.2d 668 (9th Cir. 1988) ...........................................39

*Chalk v. United States District Court Central District of California*, 840 F.2d 701 (9th Cir. 1988) ...........................................32

*Chamber of Commerce of U.S. v. Whiting*, 131 S. Ct. 1968 (2011).....................50

*City of Los Angeles v. Lyons*, 461 U.S. 95 (1983) .................................................41

*Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936 (9th Cir. 2011) ...........................................39

*Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363 (2000)..............................51

*Dahl v. HEM Pharm. Corp.*, 7 F.3d 1399 (9th Cir. 1993)...................................23

*De Canas v. Bica*, 424 U.S. 351 (1976).................................................... 53, 54, 55

*Dominguez v. Schwarzenegger*, 596 F.3d 1087 (9th Cir. 2010)...........................4

*eBay Inc. v. MercExchange, L.L.C.,* 547 U.S. 388 (2006) ...................................26

*Elrod v. Burns*, 427 U.S. 347 (1976) .......................................................24

*Equal Access Educ. v. Merten*, 305 F. Supp. 2d 585 (E.D. Va. 2004) .................55

*Flexible Lifeline Sys., Inc. v. Precision Lift, Inc.*, 654 F.3d 989 (9th Cir. 2011) ...........................................26

*Gadda v. State Bar of Cal.*, 511 F.3d 933 (9th Cir. 2007)....................................33

*Gade v. Nat'l Solid Waste Mgmt. Ass'n*, 505 U.S. 88 (1992)...............................50

*Goldie's Bookstore, Inc. v. Superior Court*, 739 F.2d 466 (9th Cir. 1984) ................................................................................39

*Harris v. Bd. of Supervisors, Los Angeles Cnty.*, 366 F.3d 754 (9th Cir. 2004) ...........................................................................4

*Hispanic Interest Coal. of Ala. v. Bentley*, No. 5:11-CV-2482-SLB, 2011WL 5516953 (N.D. Ala. Sept. 28, 2011)..................................55

*Incalza v. Fendi N. Am., Inc.*, 479 F.3d 1005 (9th Cir. 2007) ..............................50

*John Doe No. 1 v. Georgia Department of Public Safety*, 147 F. Supp. 2d 1369 (N.D. Ga. 2001) ...................................................57

*Kaiser v. Blue Cross of Cal.*, 347 F.3d 1107 (9th Cir. 2003) ...............................38

*League of United Latin American Citizens v. Wilson*, 908 F. Supp. 755 (C.D. Cal. 1995)...............................................................54

*Lennon v. INS*, 527 F.2d 187 (2d Cir. 1975)...........................................................7

*Lopez-Valenzuela v. Cnty. of Maricopa*, 719 F.3d 1054 (9th Cir. 2013) .............54

*Marlyn Nutraeuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873 (9th Cir. 2009)..........................................................21, 23

*McCormack v. Hiedeman*, 694 F.3d 1004 (9th Cir. 2012) ...................................22

*Miller v. Reed*, 176 F.3d 1202 (9th Cir. 1999).......................................................51

*Monarch Travel Servs., Inc. v. Associated Cultural Clubs, Inc.*, 466 F.2d 552 (9th Cir. 1972) ...................................................51

*Monterey Mech. Co. v. Wilson*, 125 F.3d 702 (9th Cir. 1997) .............................25

*Moore v. Consol. Edison Co. of N.Y., Inc.*, 409 F.3d 506 (2d Cir. 2005) ...............................................................................31

*Ne. Fla. Chapter of the Ass'n of Gen. Contractors of Am. v. City of Jacksonville*, 896 F.2d 1283 (11th Cir. 1990) ...................................25

*Ortega Melendres v. Arpaio*, 695 F.3d 990 (9th Cir. 2012) .................................25

*Park Vill. Apt. Tenants Ass'n v. Mortimer Howard Trust*, 636 F.3d 1150 (9th Cir. 2011)......................................................... 23, 24, 33

*Pillsbury Co. v. Conboy*, 459 U.S. 248 (1983) ..................................36

*Regents of the Univ. of Cal. v. Am. Broad. Cos.*, 747 F.2d 511 (9th Cir. 1984) ........................................................................21

*Reno v. American-Arab Anti-Discrimination Comm.*, 525 U.S. 471 (1999) .........................................................................................7

*Reynolds v. Rehabcare Grp. E., Inc.*, 531 F. Supp. 2d 1050 (S.D. Iowa 2008) ......................................................................................32

*Rizzo v. Goode*, 423 U.S. 362 (1976)................................................41

*Sampson v. Murray*, 415 U.S. 61 (1974) ..........................................24

*Savage v. Jones*, 225 U.S. 501 (1912) ..............................................51

*Stanley v. Univ. of S. Cal.*, 13 F.3d 1313 (9th Cir. 1994)...............22, 23

*Thalheimer v. City of San Diego*, 645 F.3d 1109 (9th Cir. 2011) ..........4

*United States v. Alabama*, 691 F.3d 1269 (11th Cir. 2012)................49

*United States v. Whitworth*, 856 F.2d 1268 (9th Cir. 1988) ...............36

*Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7 (2008) ........ 23, 26, 39

## FEDERAL STATUTES

8 U.S.C. §§ 1101, et seq..................................................................6

8 U.S.C. § 1103(a) .........................................................................6

8 U.S.C. § 1621 .............................................................................41

INA § 212(a)(9)(B)(ii), 8 U.S.C. § 1182(a)(9)(B)(ii)......................44

INA § 212(a)(9)(B)(i)(I), 8 U.S.C. § 1182(a)(9)(B)(i)(I)...............44

INA § 212(a)(9)(B)(i)(II), 8 U.S.C. § 1182(a)(9)(B)(i)(II) ...........44

## STATE STATUTES

A.R.S. § 1-501.................................................................................41

A.R.S. § 1-502.................................................................................41

A.R.S. § 28-3153(D)...........................................................................9

A.R.S. § 28-3471..........................................................................36, 37

## FEDERAL REGULATIONS

45 C.F.R. § 152.2(8) .........................................................................11

Fed. Reg. 52616 ...............................................................................11

## OTHER

DREAM Act of 2011, S. 952, H.R. 1842, 112th Cong. (2011) ...........................51

## INTRODUCTION

This case turns on the authority of states to exercise their traditional police powers.   Plaintiffs seek to invalidate a driver's license policy the Arizona Department of Transportation adopted on the grounds that the policy: (1) is preempted by unilateral action by the Secretary of the Department of Homeland Security ("DHS"); and (2) denies Plaintiffs equal protection of the laws.   The implications of Plaintiffs' legal challenges are significant.   Plaintiffs in effect argue that, by virtue of the DHS Secretary's decision to grant deferred action status to a massive group of persons who are concededly in this country illegally, the State of Arizona is deprived of its long-standing authority to regulate the issuance of driver's licenses.   Taken to their logical extreme, Plaintiffs' claims would result in wholesale preemption of state driver's licensing laws and require each and every state to issue licenses to all DACA recipients, without regard to the statutory requirements of that state or the burdens imposed on the state.   Applying well-settled precedent, the only conclusion is that no federal law or regulation preempts Arizona's authority to determine to whom it will issue a driver's license.

Despite Plaintiffs' extensive argument, this appeal involves a much narrower issue—whether the district court abused its discretion in denying Plaintiffs mandatory injunctive relief.   The district court did just what it was required to do.   When Plaintiffs requested a preliminary injunction, the district court allowed the

parties to engage in discovery on Plaintiffs' alleged irreparable harm and quickly heard and ruled on all discovery disputes the parties raised. After discovery closed, the parties fully briefed the issues, and the district judge held a two-hour evidentiary hearing, during which he extensively questioned the parties' attorneys on the issues presented. The court then thoroughly considered the issues and issued a 40-page order, evidencing the comprehensive analysis it undertook in denying injunctive relief. Although the district court dismissed one of Plaintiffs' claims, the Supremacy Clause claim, and denied preliminary injunctive relief, the court allowed Plaintiffs to proceed in litigating their Equal Protection claim.

The district court denied preliminary injunctive relief for three reasons—Plaintiffs failed to establish that: (1) they will suffer irreparable harm in the absence of injunctive relief; (2) the balance of equities tips in their favor; and (3) public policy favors the issuance of a preliminary injunction. In their opening brief, Plaintiffs present no compelling argument to overturn the district court's decision. Nor can they.

In their efforts to convince this Court to overturn the district court's decision, Plaintiffs mischaracterize the record and accuse the district court of failing to consider all of the evidence presented. In fact, the district court properly considered all of the evidence timely presented and not barred by a previous court order, which was entered at Plaintiffs' request. After considering this evidence, the

district court reached the correct conclusion because the evidence presented does not support Plaintiffs' allegations of irreparable harm and the balance of equities or public policy does not favor the issuance of an injunction.

This case belongs in the district court, where Plaintiffs will have the opportunity to litigate their Equal Protection claim. It does not belong before this Court. Plaintiffs' appeal invites the Court to re-weigh the evidence the district court considered. This Court should decline their invitation. The record amply supports the district court's decision, and is entirely devoid of any evidence that the district court abused its discretion. The district court's decision to deny Plaintiffs' motion for preliminary injunction should be affirmed.

## JURISDICTIONAL STATEMENT

Defendants agree with Plaintiffs' jurisdictional statement.

## STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

1.    Did the district court properly conclude that Plaintiffs are seeking a mandatory injunction?

2.    Did the district court properly conclude that Plaintiffs have not established irreparable harm and the remaining injunction factors weigh against an injunction?

3.    Did the district court properly conclude that Plaintiffs are not likely to succeed on the merits of their preemption claim?

## STANDARD OF REVIEW

The denial of a preliminary injunction is reviewed under the deferential abuse of discretion standard. *Harris v. Bd. of Supervisors, Los Angeles Cnty.*, 366 F.3d 754, 760 (9th Cir. 2004). "'Under this standard, [a]s long as the district court got the law right, it will not be reversed simply because the appellate court would have arrived at a different result if it had applied the law to the facts of the case.'" *Thalheimer v. City of San Diego*, 645 F.3d 1109, 1115 (9th Cir. 2011) (alteration in original) (quoting *Dominguez v. Schwarzenegger*, 596 F.3d 1087, 1092 (9th Cir. 2010)).

## STATEMENT OF THE CASE

On November 29, 2012, Plaintiffs Arizona Dream Act Coalition ("ADAC"), Jesus Castro-Martinez, Christian Jacobo, Alejandra Lopez, Ariel Martinez, and Natalia Perez-Gallegos (collectively, "Individual Plaintiffs") (Individual Plaintiffs and ADAC will be collectively referred to herein as "Plaintiffs") filed a lawsuit in the district court pursuant to 42 U.S.C. § 1983 against Arizona Governor Janice K. Brewer, the Director of the Arizona Department of Transportation ("ADOT"), John S. Halikowski, and ADOT Assistant Director Stacey K. Stanton (collectively, "Defendants").[1]  (ER 64-95.)  Plaintiffs allege that an executive order issued by

---

[1] Notably, although Plaintiffs initially filed this lawsuit as a putative class action, they have since declined to pursue class certification.  (SER 756.)  Accordingly, this lawsuit is currently limited to just five individuals and ADAC.

Governor Brewer and an agency policy adopted and implemented by ADOT: (1) violate the Supremacy Clause of the U.S. Constitution; and (2) violate the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution. (*Id.*)

Over two weeks after filing their complaint, Plaintiffs filed a Motion for Preliminary Injunction, seeking to compel Defendants to issue driver's licenses to Plaintiffs and other members of the Class they purported to represent. (ER 117-154.)  On January 14, 2013, Defendants filed a Motion to Dismiss Counts One and Two of Plaintiffs' Complaint Pursuant to Rule 12(b)(6) and, in the Alternative, Motion for Summary Judgment on Plaintiffs' Equal Protection (the "Motion to Dismiss"). (ER 310-353.) After the parties engaged in limited expedited discovery as ordered by the district court (ER 48-49), they fully briefed Plaintiffs' Motion for Preliminary Injunction as well as Defendants' Motion to Dismiss.

The district court held an extensive evidentiary hearing on both motions on March 22, 2013.  On May 16, 2013, the court entered a lengthy and detailed order: (1) denying Plaintiffs' Motion for Preliminary Injunction; (2) granting Defendants' Motion to Dismiss Plaintiffs' Supremacy Clause claim; and (3) denying Defendants' Motion to Dismiss as it pertained to Plaintiffs' Equal Protection claim and declining to convert Defendants' Motion to Dismiss Plaintiffs' Equal

Protection claim to a motion for summary judgment because Plaintiffs requested relief pursuant to Fed. R. Civ. P. 56(d).  (ER 1-40.)

Plaintiffs filed a Motion for Reconsideration on May 30, 2013.  (ER 697-717.)  In that motion, Plaintiffs urged the district court to reconsider its finding that Plaintiffs had failed to demonstrate irreparable injury and argued that, despite the district court's clear discovery ruling to the contrary, the court should have taken into account "Plaintiffs' exposure to prosecution for driving without a license." (*Id.*)  The district court denied the Motion for Reconsideration on June 6, 2013, reiterating that it was Plaintiffs who sought the discovery limitation and could not avoid that prior ruling.  (ER 41-43.)  On June 17, 2013, Plaintiffs filed an interlocutory notice of appeal as to the district court's denial of Plaintiffs' Motion for Preliminary Injunction.  (ER 44-47.)  This court has jurisdiction over the interlocutory appeal pursuant to 28 U.S.C. § 1292(a)(1).  Plaintiffs did not, and could not, appeal the court's dismissal of their Supremacy Clause claim pursuant to Fed. R. Civ. P. 12(b)(6).

## STATEMENT OF FACTS

### I.    Deferred Action As A Form Of Agency Prosecutorial Discretion.

The Immigration and Nationality Act ("INA"), 8 U.S.C. §§ 1101, *et seq.*, authorizes the DHS Secretary to administer and enforce the INA and all other laws relating to the immigration and naturalization of aliens. 8 U.S.C. § 1103(a).  As a

result, DHS, along with its related agencies, the U.S. Citizenship and Immigration Services ("USCIS") and U.S. Immigration and Customs Enforcement ("ICE"), have the ability to exercise prosecutorial discretion in determining whether to enforce the INA to seek removal of an individual who is not lawfully in the United States.

Deferred action is a form of prosecutorial discretion developed by DHS and its related agencies. Deferred action is a discretionary decision to defer legal action that would remove an individual from the country. *Lennon v. INS*, 527 F.2d 187, 191 n.7 (2d Cir. 1975). Deferred action is not expressly authorized by the INA or any other federal statute. *Reno v. American-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 484 (1999). Deferred action does not provide an individual with any substantive protection or benefit. (SER 824-26.) In fact, deferred action does not preclude DHS from commencing removal proceedings at any time against an alien. (*Id.*) As DHS has recently acknowledged, deferred action is a limited discretionary action meant to be exercised on an individualized case-by-case basis and is not intended to provide relief from deportation to a categorical group. (SER 831-33.)

## II.    The Deferred Action for Childhood Arrivals Program.

On June 15, 2012, the DHS Secretary issued a memorandum announcing the Deferred Action for Childhood Arrivals program (the "DACA Program") to the

directors of USCIS and ICE, as well as the acting Commissioner of U.S. Customs and Border Protection. (ER 203-205.) Pursuant to the DHS Secretary's memorandum, the DACA Program ordered DHS and its related agencies to exercise prosecutorial discretion to grant "deferred action" to defer temporarily removal of an entire class of illegal immigrants provided they meet certain criteria.[2] (*Id.*) The memorandum ordered that DACA Program recipients would be entitled to apply for federal work authorization documents ("EADs") for the period of deferred action.

Importantly, the DHS Secretary's memorandum reinforced the temporary and non-substantive nature of deferred action by stating the following:

> This memorandum confers no substantive right, immigration status, or pathway to citizenship. Only the Congress, acting through its legislative authority, can confer these rights. It remains for the executive branch, however, to set forth policy for the exercise of discretion within the framework of the existing law.

---

[2] Persons are eligible for the DACA Program if they can show that they (1) came to the United States under the age of 16; (2) continuously resided in the United States for at least five years preceding June 15, 2012; (3) currently attend school, have graduated from high school or obtained a general education development certificate, or are an honorably discharged veteran of the Coast Guard or Armed Forces of the United States; (4) have not been convicted of a felony offense, a significant misdemeanor, multiple misdemeanor offenses, or otherwise pose a threat to national security or public safety; and (5) are not older than 30 years old.

(ER 205.)   As of December 13, 2012, USCIS had accepted 355,899 DACA

Program applications from eligible immigrant youth, including approximately

12,924 applications from Arizona residents.  (SER 834.)

## III.   ADOT Determines that DACA Recipients Are Not Entitled to an Arizona Driver's License.

Arizona's driver's licensing law, A.R.S. § 28-3153(D), provides:

> Notwithstanding any other law, the department shall not
> issue to or renew a driver license or nonoperating
> identification license for a person who does not submit
> proof satisfactory to the department that the applicant's
> presence in the United States is authorized under federal
> law.

The Arizona statute gives ADOT the authority to determine whether

applicants for driver's licenses are able to provide "satisfactory proof" of the

applicant's authorized presence in the United States.

The announcement of the June 15, 2012 DHS memorandum introducing the

DACA Program prompted ADOT Director Halikowski and his advisors to begin

reviewing what impact the DACA Program might have on ADOT's enforcement

and administration of Arizona's driver's license program.  (SER 770.)   The

purpose of ADOT's review was to determine whether ADOT should implement

any internal policy or procedure changes as a result of the DACA Program.  (*Id.*)

Based on press releases, news articles, and other media published about the DACA

Program, Director Halikowski began to have concerns as to whether the persons

accepted in the DACA Program and who held corresponding EADs had "authorized" presence under federal law. (*Id.*) In the past, ADOT had accepted EADs as evidence of an alien's authorized presence in the United States; however, up until the DACA Program, ADOT had never been tasked with preparing for the sheer number of potential driver's license applicants using an EAD as proof of authorized presence. (SER 772.) Furthermore, although ADOT had accepted EADs in the past, it was not aware of any DHS or other agency published documents attempting to define the immigration status of individuals who have received deferred action.

ADOT conducted an intensive review of the DACA Program, which included seeking advice from USCIS as to whether the federal government considered EADs for the DACA Program as identical to EADs for other forms of deferred action. (*Id.*) In response to ADOT's inquiry to USCIS, ADOT learned that USCIS itself had expressly distinguished DACA recipients from recipients of other forms of deferred action with regard to applications for EADs. (*Id.*) Specifically, ADOT learned that USCIS had designated a separate code for DACA recipients to use in filling out USCIS form I-765, the application form used to apply for an EAD.[3] (SER 773.) Additionally, on August 28, 2012, the U.S.

---

[3] Additionally, on or around January 18, 2013, USCIS took the position that any "lawful presence" conferred by the DACA Program related only to stopping the *accrual* of unlawful presence used to calculate the length of future bars to

Department of Health and Human Services ("HHS") explicitly carved out DACA recipients from recipients of other forms of deferred action in HHS's definition of who is "lawfully present" for purposes of participating in the Pre-Existing Condition Insurance Plan Program contained in the Patient Protection and Affordable Care Act, Public Law 111-148, and the Health Care and Education Reconciliation Act, Public Law 111-152.[4]

On or around September 17, 2012, in response to Director Halikowski's significant concerns, ADOT revised Policy 16.1.4 ("ADOT Policy") , which

---

admissibility.  (ER 366-67.) ("While your deferred action is in effect and, for admissibility purposes, you are considered to be lawfully present in the United States during that time.").  USCIS also made clear that, even if the DACA Program confers "authorized" or "lawful" presence for the expressly limited purpose of stopping the accrual of unlawful presence for future bars to admissibility, it does not purport to define such terms in other contexts, such as state driver's licensing laws. *Id.* ("Apart from the immigration laws, 'lawful presence,' 'lawful status,' and similar terms are used in various other federal and state laws.  For information on how those laws affect individuals who receive a favorable exercise of prosecutorial discretion under DACA, please contact the appropriate federal, state or local authorities.").

[4] Specifically, HHS implemented an exception to exclude DACA recipients from individuals considered "lawfully present" for purposes of the Pre-Existing Condition Insurance Plan Program.  The exception provided, "(8) Exception: *An individual with deferred action under the Department of Homeland Security's deferred action for childhood arrivals process*, as described in the Secretary of Homeland Security's June 15, 2012 memorandum, *shall not be considered to be lawfully present* with respect to any of the above categories in paragraphs (1) through (7) of this definition" Fed. Reg. 52616; 45 C.F.R. § 152.2(8) (emphasis added).

addressed establishing authorized presence for purposes of Arizona's driver's license statute. (ER 189-192.)

## IV. Governor Brewer Issues Executive Order 2012-06 Reaffirming Arizona's Stated Intent to Limit Access to Public Benefits.

On August 15, 2012, after Director Halikowski had initiated his review of the DACA Program but before ADOT had issued its policy, Governor Brewer issued Executive Order 2012-06 (the "Executive Order") to reaffirm the intent of Arizona law in response to the DACA Program. The Executive Order emphasized:

- 8 U.S.C. § 1622 authorizes states to determine eligibility for any state public benefits for most classes of aliens, including aliens with deferred action.

- A.R.S. § 28-3153 prohibits ADOT from issuing a driver's license unless the applicant submits proof satisfactory to ADOT that the applicant's presence is authorized under federal law.

- The federal executive's DACA policy and the resulting federal paperwork issued could result in unlawfully present aliens inappropriately gaining access to public benefits contrary to the intent of Arizona voters and lawmakers who enacted laws expressly restricting access to taxpayer funded benefits and state identification.

- Allowing more than an estimated 80,000 DACA recipients improper access to state or local public benefits "will have significant and lasting impacts on the Arizona budget, its health case system and additional public benefits that Arizona taxpayers fund."

(ER 200-201.) The Executive Order directed state agencies to review existing policies and make necessary changes, consistent with Arizona law and federal law, to prevent persons not entitled to benefits under state law from obtaining those benefits, including driver's licenses. (*Id.*)

**V.     Plaintiffs Allege Irreparable Harm and Seek a Preliminary Injunction of the Executive Order and ADOT Policy.**

On November 29, 2012, ADAC and the Individual Plaintiffs filed a complaint against Governor Brewer, Director Halikowski, and Assistant Director Stanton.  (ER 64-95.)  Plaintiffs claimed that the Executive Order and the ADOT Policy violated the Supremacy Clause of the U.S. Constitution and the Equal Protection Clause of the Fourteenth Amendment.  (*Id.*)  A few weeks later, Plaintiffs filed a Motion for Preliminary Injunction alleging irreparable harm as a result of the Executive Order and ADOT Policy.  (ER 117-154.)

In the Motion for Preliminary Injunction, Plaintiffs claimed various forms of irreparable harm.  The Individual Plaintiffs claimed that, as a result of not being able to obtain driver's licenses,  they suffered irreparable injury in the form of: (a) the deprivation of a constitutional right; (b) the impediment to securing gainful employment, advancing their careers, and achieving economic self-sufficiency; and (c) the emotional and psychological harm caused by alleged discrimination. (ER 25-27.)  ADAC claimed that the Executive Order and ADOT Policy have caused it irreparable injury by forcing it to divert its organizational resources to address the Executive Order and ADOT Policy.  (*Id.*)

## VI.  The District Court Permits Limited Discovery on Plaintiffs' Alleged Irreparable Injury.

At the outset of the case, the district court conducted a telephonic conference with the parties.  As a result of that conference, the court ordered "four weeks of limited discovery" aimed at the issues raised in Plaintiffs' Motion for Preliminary Injunction.  (ER 48.)

On January 29, 2013, counsel participated in a telephonic hearing with the district court to address various discovery disputes that had arisen regarding upcoming depositions. (ER 511-558.)   One of the discovery disputes involved whether Defendants could inquire into the extent to which the Individual Plaintiffs, prior to the DACA Program, had participated in the activities they now alleged to be the subjects of their alleged irreparable harm, *i.e.* driving.  Plaintiffs asked the court to preclude Defendants from asking about the Individual Plaintiffs' prior driving habits.  During that hearing, the court proposed to resolve the issue by granting Plaintiffs' request to preclude Defendants from asking about how the Individual Plaintiffs were able to obtain employment, drive or otherwise transport themselves without valid driver's licenses, but only if Plaintiffs were also precluded from arguing that the risk of driving illegally constituted irreparable harm.  Plaintiffs' counsel expressly agreed with the court's proposed resolution of the discovery dispute:

MS. TUMLIN:     [O]ur plaintiffs are, you know, in that situation are between the proverbial rock and a hard place. So either they were obtaining employment by, the hypotheticals are, driving without a license therefore subjecting themselves to risk of prosecution for driving without a license, or driving with someone else's license therefore subjecting themselves to prosecution for that . . . .

THE COURT:  . . . I assume, given what you've said, you would not then be able to come forward and say, but, Judge, to get that job they had to put themselves at risk, which they don't have to do under the DACA program, because you will have foreclosed the defendants from inquiring into that very subject. Do you agree?

MS. TUMLIN: *I think that might be right, Your Honor*.

(ER 539-540.) (Emphasis added.)  The court followed up the hearing with a formal order as to the discovery dispute:

Defendants may conduct discovery of what daily activities Plaintiffs have been able to conduct in the past, such as driving children to school or taking children to the doctor's office; what kinds of employment Plaintiffs have held in the past, including whether Plaintiffs have driven to work or drive for work, and the times and locations of their driving and what educational opportunities Plaintiffs have been utilizing in the past, including whether they drove to school.  The Court deems irrelevant, and Defendants will not be permitted to inquire into, how Plaintiffs obtained jobs or were able to drive.  Plaintiffs' undocumented status in this country is undisputed.  How they went about obtaining work or driving is not relevant to the equal protection and pre-emption arguments made in this case.  As a corollary, however, Plaintiffs will not be permitted to argue that they were forced to drive or work illegally and that they are irreparably harmed by the inability to work or drive

15

> legally.  If information on how Plaintiffs were able to undertake past work and driving is unavailable to Defendants, it will also be unavailable to Plaintiffs.

(ER 50-51.)

The deposition testimony of the Individual Plaintiffs and a representative of ADAC did not support Plaintiffs' allegations of irreparable harm.  Instead, the Individual Plaintiffs freely admitted that they either: (1) owned cars and drove on a regular basis for their work-related, educational, and social and personal needs; (2) used others' cars to regularly drive for those same purposes; and/or (3) had someone readily available to drive them for those same purposes on the occasions when they do not drive themselves.  Additionally, ADAC failed to provide any evidence that it had been forced to divert its organizational resources, and instead could not quantify with any specificity the effect of the Executive Order or ADOT Policy on its resources.

## VII.  The District Court Dismisses Plaintiffs' Supremacy Clause Claim and Denies Plaintiffs' Motion for Preliminary Injunction.

On May 16, 2013, following an evidentiary hearing, the district court entered an order (1) granting Defendants' Motion to Dismiss Plaintiffs' Supremacy Clause claim, (2) denying Defendants' Motion to Dismiss Plaintiffs' Equal Protection claim, and (3) denying Plaintiffs' Motion for Preliminary Injunction. (ER 1-40.)

The court not only concluded that Plaintiffs did not establish a likelihood of success on the Supremacy Clause claim, but also dismissed the claim on its face, noting that "even under the lenient Rule 12(b)(6) standard, the claim is not based on a cognizable legal theory." (ER 40.)   The court denied the Motion for Preliminary Injunction due to Plaintiffs' failure to demonstrate irreparable injury. (ER 33-38.)  Specifically, the court noted that (a) although Plaintiffs demonstrated a likelihood of success on their Equal Protection claim based on the state of the evidence at that time, this potential violation does not rise to the level of irreparable harm; (b) the fact that the Individual Plaintiffs cannot obtain driver's licenses is not irreparable injury because they "have acknowledged . . . that they either drive or have readily available alternative means of transportation"; and (c) Plaintiffs failed to provide sufficient evidence that the allegations of emotional harm rose to the level of irreparable injury.  (*Id.*)

Because Plaintiffs' post-discovery briefing asked the district court to take into account, for purposes of assessing irreparable harm, the potential fear that the Individual Plaintiffs faced in driving without a license, the court's order reminded Plaintiffs of the prior discovery ruling that had been entered *at Plaintiffs' request.* In its order, the court reiterated:

> Plaintiffs asked the Court to preclude Defendants from inquiring into how Plaintiffs were able to drive, obtain jobs, and engage in activities without valid Arizona driver's licenses.   The Court agreed to bar such

17

> inquiries, but in exchange precluded Plaintiffs from arguing that they are irreparably harmed either by being forced to engage in illegal activities or by fear of prosecution for engaging in such activities.

(ER 36.)

Plaintiffs filed a Motion for Reconsideration of the court's ruling on the preliminary injunction. Plaintiffs based the motion, in large part, on their position that the court should take Plaintiffs' fear of driving into account in assessing irreparable harm. (ER 697-717.) The district court denied the motion and again explained to Plaintiffs that their request for the discovery limitation barred the same argument they relied upon:

> The discovery order barred Defendants from inquiring into how Plaintiffs were able to drive, obtain jobs, and engage in similar activities without valid Arizona driver's licenses. In exchange for this protection—requested by Plaintiffs—the order precluded Plaintiffs from arguing that they are irreparably harmed by being forced to engage in illegal activities or by fear of prosecution for engaging in illegal activities.

(ER 42.)

## SUMMARY OF THE ARGUMENT

The Court should affirm the district court's decision denying Plaintiffs injunctive relief because Plaintiffs have failed to establish: (1) irreparable harm in the absence of a preliminary injunction; or (2) that the balance of equities or public policy favors the issuance of an injunction. The record reveals no evidence that Plaintiffs will suffer any irreparable harm during the pendency of this litigation, let

alone the extreme and very serious damage required for a mandatory injunction. The reason for this is simple: Each of the Individual Plaintiffs drive or have readily available alternative means of transportation. Thus, they can work, go to school, and attend to their daily needs without driver's licenses. Similarly, ADAC has not provided any evidentiary support for the purported harms that it claims it will suffer.

Although Plaintiffs do not face harm, Defendants face potentially serious ramifications if they give driver's licenses to a large group of people who might not be entitled to them. Thus, the balance of equities tips in Defendants' favor. Further, interfering in a state agency's decision in an area reserved for its traditional police power—the issuance of driver's licenses—would not serve the public interest.

Because Plaintiffs cannot establish irreparable harm, that the balance of equities tips in their favor, or that the public interest favors an injunction, the Court need not address Plaintiffs' preemption argument. The district court concluded that Plaintiffs were likely to succeed on their Equal Protection claim. Thus, whether Plaintiffs are likely to succeed on a second claim is irrelevant to the issue of whether they are entitled to a preliminary injunction. If the Court chooses to address Plaintiffs' preemption argument, however, it will find that the district court correctly concluded that Plaintiffs' preemption argument fails as a matter of law.

Plaintiffs attempt to expand the concept of preemption to infringe upon Arizona's long-standing authority to regulate the issuance of driver's licenses. They fail. USCIS has confirmed that even though DACA recipients are not accruing unlawful presence for future bars to admissibility, this does not remotely make their presence lawful or authorized. Indeed, recent federal regulations, and a full review of USCIS's guidance, make clear that DACA recipients are not authorized or lawfully present for any other federal or state purposes. For this reason, Defendants can separately determine that DACA recipients cannot establish presence authorized by federal law for the distinct purpose of Arizona's driver's license statute. Only Congress, through the creation of federal law, can authorize an individual's presence in the United States. Arizona's determination does not conflict with Congress's decision to delegate to the Executive the administration and enforcement of federal immigration law because neither the Executive Order nor the ADOT Policy determines whether DACA recipients can remain in Arizona.

In any event, the Executive Order and ADOT Policy do not undermine the federal government's determination that DACA recipients be permitted to work for three reasons. First, neither the ADOT Policy nor the Executive Order makes any determination as to who may work. Second, Plaintiffs cannot show that Congress intended for DACA recipients to work. Third, even if Plaintiffs could make this

showing, the denial of a single form of transportation does not impose an obstacle to these intentions.

Finally, Plaintiffs' "constitutional preemption" argument has no basis in law. The Supreme Court has recognized only three categories of preemption: express, field, and conflict. Accordingly, Plaintiffs' "constitutional preemption" argument fails at the outset. But, even if this Court could create a constitutional preemption category, Plaintiffs have not shown that the Executive Order and ADOT Policy are regulations of immigration or that they create classifications of immigration status different than those created under the INA. The district court properly concluded that Plaintiffs had no likelihood of success on their preemption claim.

## ARGUMENT

## I.    PLAINTIFFS SEEK A MANDATORY INJUNCTION, REQUIRING THEM TO MEET A HEIGHTENED STANDARD OF PROOF.

The district court properly concluded that Plaintiffs seek a mandatory injunction. As Plaintiffs note, the test for whether an injunction is prohibitory or mandatory can be found with regard to the injunction's effect on the "status quo ante litem," or the "last, uncontested status which preceded the pending controversy." *Marlyn Nutraeuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 879 (9th Cir. 2009) (quoting *Regents of the Univ. of Cal. v. Am. Broad. Cos.*, 747 F.2d 511, 514 (9th Cir. 1984)). Whereas prohibitory injunctions "preserve the status quo *between the parties* pending a resolution of a case on the

merits," mandatory injunctions require a party to act and go beyond simply maintaining the status quo. *McCormack v. Hiedeman*, 694 F.3d 1004, 1019 (9th Cir. 2012) (emphasis added); *Stanley v. Univ. of S. Cal.*, 13 F.3d 1313, 1320 (9th Cir. 1994).

Here, Plaintiffs contend that the district court erroneously concluded "the status quo in this case refers the period *after* Arizona implemented its unconstitutional policy." (Opening Br. at 41.) But Plaintiffs mischaracterize the district court's conclusion. The district court specifically looked to the status quo between the parties "[b]efore implementation of the DACA program and issuance of the Executive Order (which occurred on the same date, August 15, 2012)." (ER 7.)

Based on this, the district court found that, before implementation of the DACA Program and issuance of the Executive Order, Defendants did not issue driver's licenses to the Individual Plaintiffs, or other persons who later became eligible for relief under the DACA program, because they were not eligible for driver's licenses. (*Id.*) Whether Defendants, prior to the announcement of the DACA Program, accepted EADs as sufficient proof for issuing driver's licenses to individuals under programs other than DACA is irrelevant. That circumstance did not exist *between the parties* to this case and thus does not constitute the status quo. *See McCormack*, 694 F.3d at 1019. Because Plaintiffs seek to change the

status quo by requiring Defendants to issue driver's licenses to them and other DACA recipients, they request a mandatory injunction.

The fact that Plaintiffs seek a mandatory injunction is significant. Mandatory injunctions require a higher level of proof than prohibitory injunctions because they impose affirmative obligations on parties at the very beginning of a case and before full discovery or a trial on the merits. For this reason, they are "particularly disfavored" and not granted unless "extreme or very serious damage will result." *Park Vill. Apt. Tenants Ass'n v. Mortimer Howard Trust*, 636 F.3d 1150, 1160 (9th Cir. 2011) (quoting *Marlyn Nutraceuticals*, 571 F.3d at 879). And courts only grant such relief when "the facts and law clearly favor the moving party." *Stanley*, 13 F.3d at 1320; *see also Dahl v. HEM Pharm. Corp.*, 7 F.3d 1399, 1403 (9th Cir. 1993) ("'Mandatory preliminary relief' is subject to heightened scrutiny and should not be issued unless the facts and law clearly favor the moving party.").

## II. THE DISTRICT COURT ACTED WELL WITHIN ITS DISCRETION IN FINDING THAT PLAINTIFFS HAVE NOT ESTABLISHED IRREPARABLE HARM.

Plaintiffs bear the burden to establish that, absent a preliminary injunction, they will suffer irreparable harm. *See Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 21-23 (2008). This burden is not easy to meet. "Mere injuries, however substantial, in terms of money, time and energy necessarily expended in

the absence of a stay, are not enough.  The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm."  *Sampson v. Murray*, 415 U.S. 61, 90 (1974) (citation omitted).  Further, because Plaintiffs are seeking a mandatory injunction, they must make an even greater showing of injury by establishing that "extreme or very serious damage" will result in the absence of an injunction.  *Park Vill. Apt. Tenants Ass'n*, 636 F.3d at 1160.  Plaintiffs cannot meet their burden.  In fact, the record demonstrates that Plaintiffs have set forth no evidence establishing that they will suffer irreparable harm, or, especially not, "extreme or very serious damages," in the absence of a preliminary injunction.

## A.     Plaintiffs' Allegations of Constitutional Violations Do Not Create a Presumption of Irreparable Harm.

Plaintiffs assert that being subjected to an equal protection violation in and of itself constitutes irreparable injury.  (Opening Br. at 42-45.)  But this is too broad an assertion.  Courts have held that a violation of a constitutional right may in limited circumstances not present here constitute irreparable harm.  These circumstances often involve the loss of First Amendment freedoms.  *See, e.g.*, *Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.").  The U.S. Supreme Court and Ninth Circuit have never concluded, however, that circumstances involving a violation of an individual's equal

24

protection rights in and of itself demonstrates irreparable injury. *See Ne. Fla. Chapter of the Ass'n of Gen. Contractors of Am. v. City of Jacksonville*, 896 F.2d 1283, 1285 (11th Cir. 1990) ("No authority from the Supreme Court or the Eleventh Circuit has been cited to us for the proposition that the irreparable injury needed for a preliminary injunction can properly be presumed from a substantially likely equal protection violation.").

Plaintiffs cite two Ninth Circuit cases, *Ortega Melendres v. Arpaio*, 695 F.3d 990 (9th Cir. 2012), and *Monterey Mech. Co. v. Wilson*, 125 F.3d 702 (9th Cir. 1997), to support their assertion that this Court presumes irreparable harm when an equal protection violation is alleged. In *Ortega Melendres*, however, the Ninth Circuit addressed Fourth Amendment violations. 695 F.3d at 995. The Court concluded that, because each of the plaintiffs had been stopped previously by police officers, they faced a "real possibility that they would again be stopped or detained and subjected to unlawful detention on the basis of unlawful presence alone" in the absence of a preliminary injunction. *Id.* at 1002. Thus, even though the Court concluded that Fourth Amendment violations were sufficient to establish irreparable harm, it specifically analyzed the harm alleged. *Id.*

Similarly, in *Wilson*, the Court did not hold that an equal protection violation is presumed to cause irreparable harm and instead remanded the matter for the district court to consider evidence of irreparable injury. 125 F.3d at 715.

Recent cases out of this Court reinforce that irreparable harm must be analyzed rather than presumed, regardless of the type of harm alleged. Specifically, in *Flexible Lifeline Sys., Inc. v. Precision Lift, Inc.*, 654 F.3d 989, 995 (9th Cir. 2011), the Court found that two recent Supreme Court decisions, *eBay Inc. v. MercExchange, L.L.C.,* 547 U.S. 388 (2006), and *Winter v. Natural Resources Defense Council, Inc.,* 555 U.S. 7 (2008), precluded a presumption of irreparable harm in copyright cases. *eBay* refused to presume irreparable harm in patent cases, while *Winter* concluded the Ninth Circuit's grant of a preliminary injunction on the mere "possibility" of irreparable harm was too lenient. Accordingly, this Court concluded that "[i]f our past standard, which required a plaintiff to demonstrate at least a possibility of irreparable harm, is 'too lenient,' then surely a standard which presumes irreparable harm without requiring any showing at all is also 'too lenient.'" *Flexible Lifeline Sys., Inc.*, 654 F.3d at 997.

Although *Ortega Melendres*, *Wilson*, and *Flexible Lifeline* address different types of harms, they share one important point—in each, the Ninth Circuit has not presumed irreparable harm. Instead, it has looked to the specific injury alleged to determine whether irreparable harm has been established.

Here, the district court properly concluded, consistent with Ninth Circuit case law, that irreparable harm could not be presumed. Rather, the district court found that "the nature of the injury [Plaintiffs] will suffer from being denied equal

protected must be examined." (ER 34.)  As detailed below, an examination of the injuries alleged by Plaintiffs shows that Plaintiffs' alleged injuries do not constitute irreparable harm, much less "extreme or very serious damage."

### B.  Plaintiffs' Own Testimony Establishes that They Have Not Suffered Any Harms Related to Employment, Family Relations, and Everyday Activities.

Plaintiffs contend that the district court abused its discretion by failing to consider "evidence of Plaintiffs' non-compensable harms caused by Defendants' policy—including limitations on Plaintiffs' professional opportunities, restrictions on their ability to accomplish simple errands, and an inability to visit family and friends." (Opening Br. at 46.)  This contention is unsupported by the record.  The district court specifically considered the evidence of Plaintiffs' alleged non-compensable harms.  (ER 35-36.)  The district court concluded, however, that because Plaintiffs have acknowledged "that they either drive or have available means of transportation," they are not "suffering irreparable harm from being unable to drive as a result of Defendants' policy."  (*Id.*)

The district court's decision was soundly based on the evidence presented. Specifically, one of the Individual Plaintiffs[5] testified:

---

[5] Pursuant to the district court's order precluding the use of the Individual Plaintiffs' names at the preliminary injunction hearing in referring to their individual driving habits, Defendants do not refer specifically by name herein to any of the Individual Plaintiffs.

- There is always a way to get somewhere by car to attend to daily needs such as grocery shopping or taking her children to the doctors; when her husband is not available to drive her, she drives herself or other people drive her.

- Her father or husband always drove her to school or to her previous employment.

- Her inability to secure various employments had nothing to do with lacking a driver's license.

- Because she goes everywhere by car, she never takes the bus and has no idea where the closest bus stop to her house is located.

(ER 599-601; SER 903-08.)

Another Individual Plaintiff testified:

- She drove to her lawyer's office before traveling to her deposition.

- Not having a driver's license does not impact her ability to work, go to school, or function in daily life; she either drives herself or someone drives her.

- She has been driving her sister's car to school since 2009; she presently drives it every day Monday through Friday to travel to and from work and school.

- She has no plans to change her current employment or school and will continue to drive her sister's car to both places.

(ER 621-22; SER 910-14.)

Another Individual Plaintiff testified:

- He is the only person that uses his mother's car, which he has driven to current and prior employment, school, and to attend sporting activities since he was 17.

- He currently drives his mother's car six days a week; his job often means he has to drive all over the Phoenix area.

- He also drives for social purposes or gets rides from friends and sometimes drives his employer's van.

- He has no plans to change his current employment or educational institution and intends to keep driving to both places.

- His failure to secure two job positions has had nothing to do with his lack of a driver's license.

(ER 651-54, SER 926-38.)

Another Individual Plaintiff testified:

- He drove to his attorney's office in order to travel to his deposition.

- He owns two cars: a Ford Econoline which he uses for his carpet cleaning business, and a Mercury Cougar which he uses for social occasions.

- He previously owned a Volkswagen Cabriolet.

- In addition to regularly driving his van to every job for his carpet cleaning business, of which he is the sole employee, he also regularly drives to martial arts classes and to educational classes at two different institutions.

(ER 631-34, 636-37; SER 916-24.)

Another Individual Plaintiff testified:

- He owns a 2001 Honda Accord, insured and registered in his name, which he purchased in April 2012 so he could drive to work at his former gas station assistant manager position, a position of responsibility. He used to drive to work five to six days a week.

- Previously, he occasionally used his mother's car from 2004 to 2008 to drive to community college. From 2008 until 2012, he regularly

drove his friend's car an estimated five days a week to travel to work and school, and to drive to social events in the evening.[6]

- Nobody at his former spa job ever told him he was in danger of losing his job because he did not drive to work.

(ER 665-66, 676; SER 892-901.)

The testimony detailed above, and thoroughly considered by the district court, reveals that Plaintiffs selectively quote soundbites from their deposition testimony in an attempt to establish irreparable harm. But, their deposition testimony, on the whole, makes clear that the Individual Plaintiffs either: (1) own cars and drive on a regular basis to take care of their daily work, educational, and social and personal needs; (2) use others' cars to regularly drive for those same purposes; and/or (3) have someone readily available to drive them for those same purposes on the occasions when they do not drive themselves.

The Individual Plaintiffs' deposition testimony also reinforces the facts that all of the Individual Plaintiffs: (1) are currently working, except for one Individual Plaintiff, who is principally a caregiver to her child; (2) are economically self-sufficient; and (3) have had no problem obtaining higher education. As a result, none of the Individual Plaintiffs face "onerous restrictions" on their daily lives. In fact, the Individual Plaintiffs are generally planning to carry on doing exactly what

---

[6] Even though he has driven regularly since 2004, and still owns his car, this particular Individual Plaintiff claims he has now stopped driving his car out of fear he would get into trouble for driving illegally now that he has received his grant of deferred action and is "in the system." (ER 669-70.)

they are currently doing. For these reasons, Plaintiffs cannot establish that, in the absence of a preliminary injunction, they will suffer irreparable harm, much less the "extreme and very serious damage" required for a mandatory injunction.

### C. **The Record Does Not Support Plaintiffs' Contention that They Have Suffered Stigmatic and Psychological Harm.**

The Individual Plaintiffs allege that they have suffered stigmatic and psychological harm stemming from: (1) the perception that they are inferior because they do not have a driver's license; and (2) the fear of being stopped and ticketed for not having a driver's license. (Opening Br. at 51-53.)

With respect to the first category of harm, Plaintiffs fault the district court for not considering this evidence. (Opening Br. at 51-52.) They mischaracterize the district court's decision. The court specifically considered the evidence set forth by Plaintiffs. (ER 36-38.) This evidence, however, included just the declaration and deposition testimony of a single Individual Plaintiff. (*Id.*)

The testimony of the single Individual Plaintiff—in which the Plaintiff explains that he "was crushed" when he could not get a driver's license—is too remote and speculative to sufficiently establish irreparable harm. *Cf. Moore v. Consol. Edison Co. of N.Y., Inc.*, 409 F.3d 506, 511 (2d Cir. 2005) (finding that plaintiff failed to demonstrate irreparable injury where her alleged psychological harm and emotional stress stemming from racial discrimination at work and a subsequent poor work performance review amounted to "sheer speculation");

*Reynolds v. Rehabcare Grp. E., Inc.*, 531 F. Supp. 2d 1050, 1067 (S.D. Iowa 2008) (finding that plaintiff's "reduced sense of well-being" and continued stress from being discriminated against and fired from her job as a result for her participation in the armed services did not constitute the type of irreparable harm necessary for a preliminary injunction).

In support, Plaintiffs rely on *Chalk v. United States District Court Central District of California*, 840 F.2d 701 (9th Cir. 1988). But, a review of *Chalk* demonstrates that the basis for the court's finding of irreparable harm is far different than that alleged by Plaintiffs. In *Chalk*, the plaintiff was transferred from a classroom teaching position to an administrative position after he was diagnosed with AIDS. *Id.* at 703. The Ninth Circuit reversed the district court's finding of no irreparable harm, concluding:

> Chalk's original employment was teaching hearing impaired children in a small-classroom setting, a job for which he developed special skills beyond those normally required to become a teacher. His closeness to his students and his participation in their lives is a source of tremendous personal satisfaction and joy to him and of benefit to them. The alternative work to which he is now assigned is preparing grant proposals. This job is 'distasteful' to Chalk, involves no student contact, and does not utilize his skills, training or experience. Such non-monetary deprivation is a substantial injury which the court was required to consider.

*Id.* at 709.

Here, the evidence presented by Plaintiffs is nowhere near the emotional harm described in *Chalk*.  As the district court noted, "The emotional effect of being denied a driver's license simply is not the same as losing a job for which one has obtained special training and experience, and the accompanying separation from special-needs children to whom the plaintiff had become attached and whom he was uniquely qualified to help."  (ER 37.)  Accordingly, the evidence presented does not establish irreparable harm, much less "extreme or very serious damage" required for mandatory injunctive relief.  *Park Vill. Apt. Tenants Ass'n*, 636 F.3d at 1160.

Additionally, as evidenced by the single declaration addressing this issue, the emotional harms described by one Plaintiff are not shared by the other Individual Plaintiffs.  Thus, even if the evidence presented were sufficient to establish irreparable harm (it is not), Plaintiffs cannot collectively show that they would suffer irreparable harm in the absence of a preliminary injunction.

With respect to the second category of harm, the district court properly excluded any evidence of emotional and psychological harm stemming from the "fear of being stopped and ticketed for not having a driver's license" for two reasons.  First, Plaintiffs raised evidence of this type of harm for the first time in their reply brief.  As a result, they waived this argument.  *See Gadda v. State Bar of Cal.,* 511 F.3d 933, 937 n.2 (9th Cir. 2007) ("It is well established that issues

cannot be raised for the first time in a reply brief."); *Bazuaye v. INS*, 79 F.3d 118, 120 (9th Cir. 1996) (noting that issues raised for the first time in a reply brief are waived).  Second, as detailed below, a district court order, issued at Plaintiffs' request, specifically barred Plaintiffs from arguing that they were irreparably harmed based on any fear of being prosecuted for driving without a license. Accordingly, the district court properly excluded such evidence.

### D.    The District Court Properly Excluded Evidence of Harm from Potential Prosecution of Driving Without a License.

In January 2013, Plaintiffs asked the district court to preclude Defendants from inquiring into how Plaintiffs were able to drive, obtain jobs, and engage in similar activities without valid Arizona driver's licenses. (ER 50-52.)  The district court agreed to bar such inquiries but, in exchange, precluded Plaintiffs from arguing that being forced to engage in illegal activities, or any fear of prosecution stemming from engaging in such activities, caused irreparable harm. (*Id*.)

Plaintiffs now assert that they never prohibited Defendants from inquiring into how they obtained licenses or were able to drive.  The record, however, demonstrates that this assertion is false.  On January 29, 2013, the parties' counsel participated in a telephonic hearing with the district court to address various discovery disputes.  During that hearing, Plaintiffs' counsel agreed that Defendants could ask deposition questions about whether the Individual Plaintiffs had been driving before their DACA grants, but sought to prevent discovery into the means

by which the Individual Plaintiffs might have been driving. (ER 540-41.) Specifically, during the hearing, Plaintiffs' counsel stated that, if the Individual Plaintiffs drove, she would allow discovery into where the Individual Plaintiffs drove and how often the Individual Plaintiffs drove, so long as the "valid licensing question [was] off the table." (*Id*.) In turn, the district court orally held that such a distinction foreclosed Plaintiffs from arguing they are irreparably harmed by the risk they encounter from driving and/or working illegally. (ER 553-54.)

After the district court dictated its holding during the telephonic conference, Plaintiffs' counsel had an opportunity to ask questions. Plaintiffs' counsel, however, kept silent and never claimed that the district court's holding was incorrect. (ER 557.) The district court's February 8, 2013 Order confirmed that Plaintiffs' fear of being caught for driving illegally is inadmissible as irreparable harm. (ER 50-52.)

Plaintiffs now contend that even if they initially sought to bar Defendants' inquiries into unlicensed driving, Defendants "opened the door" to this information during depositions by inquiring into whether the Individual Plaintiffs drove without a license. (Opening Br. at 55.) An examination of the Individual Plaintiffs' deposition transcripts, however, reveals that, consistent with the February 8, 2013 Order, Defendants' counsel never inquired into *how* the Individual Plaintiffs were able to drive. In fact, Defendants' counsel never asked

whether any of the Individual Plaintiffs, at any time, drove with a driver's license or had a driver's license under another person's name. Instead, Defendants merely asked, and asserted in briefing, that Plaintiffs drove, which was expressly permitted by the order (and Plaintiffs' counsel's representations during the hearing). Thus, they never "opened the door" to Plaintiffs' introduction of this evidence, as Plaintiffs now claim.[7] For this reason, Plaintiffs' citation to cases addressing the rule of curative admissibility—which courts typically use in the criminal context to remove unfair prejudice from a party introducing inadmissible evidence at trial—is inapposite.

Even if the rule of curative admissibility were somehow applicable, the rule's remedy is limited. Courts allow the introduction of inadmissible evidence "to rebut any false impression that might have resulted from the earlier admission." *United States v. Whitworth*, 856 F.2d 1268, 1285 (9th Cir. 1988) (discussing the admission of inadmissible evidence during a cross-examination). Plaintiffs, however, are not attempting to introduce evidence that *rebuts* any discovered

---

[7] Plaintiffs also argue that they "opened the door" by not asserting the Fifth Amendment privilege during their depositions. (Opening Br. at 55-56.) As explained below, driving without a license is not a crime. Rather, it is a civil violation. *See* A.R.S. § 28-3471. Potential civil liability has never been held to trigger a Fifth Amendment privilege. *Pillsbury Co. v. Conboy*, 459 U.S. 248, 296, n.20 (1983) (Stevens, J. and O'Connor, J., dissenting). Thus, even if Plaintiffs were asked questions about driving without a license (which they were not), Plaintiffs could not have "opened the door" by failing to assert a Fifth Amendment privilege because they had no Fifth Amendment privilege to assert in response to those questions.

information.  Instead, they are attempting to circumvent the district court's order by introducing *arguments* that have been expressly prohibited.

Finally, whether the district court considered evidence of harm stemming from the fear of being prosecuted for driving without a license is inconsequential. The district court would have reached the same result even if it had considered such evidence.  Driving without a license is not a crime—an individual is only subjected to civil penalties.  *See* A.R.S. § 28-3471.

### E.     ADAC Has Not Independently Established Irreparable Harm.

ADAC asserts that it faces irreparable injury as an organization. Specifically, ADAC claims that it has been unable "to carry out activities that are core to its missions due to Defendants' policy, including time-sensitive activities relating to the 2012 elections."  (Opening Br. at 58.)  This assertion fails to establish irreparable harm for three reasons.  First, ADAC overlooks the fact that, in responding to the ADOT Policy, it was carrying out activities that are core to its mission—assisting those who seek to obtain the benefits of the proposed DREAM Act and the DACA Program.  Thus, ADAC has not suffered irreparable harm by addressing issues that its organization was formed to address.

Second, ADAC focuses on harms it has suffered related to the 2012 elections.  But past injury does not meet the irreparable harm requirement. *Kaiser*

*v. Blue Cross of Cal.*, 347 F.3d 1107, 1115 (9th Cir. 2003). Instead, ADAC must show that the denial of a preliminary injunction will cause a future harm. *Id.*

Third, the evidence presented by ADAC on the issue of future harm demonstrates that ADAC cannot demonstrate any actual harm caused by the Executive Order and ADOT Policy because:

- ADAC cannot provide any evidence of revenue or money spent for any given year between 2009 and the present, not even tax returns or organization financials. (SER 875-881.)

- ADAC does not keep time records for the work of its members and is unable to calculate the total number of hours spent by ADAC volunteers on any given ADAC project or initiative. (SER 882-84.)

- ADAC cannot determine with accuracy how many of its total members have a driver's license issued by any state. (SER 886-87.)

- ADAC has never actually performed an analysis of the frequency in which its members have been unable to participate in ADAC events for transportation reasons. (SER 885-86.)

- ADAC is unable to quantify how many more members it would have, if any, if DACA recipients could get driver's licenses. (SER 888-90.)

In short, despite ADAC's assertions that the Executive Order and ADOT Policy have caused ADAC to divert its resources, incur greater costs, and lose out on members, ADAC cannot quantify in any manner or produce any documents to support any of the allegations of irreparable harm to the organization. This is fatal to ADAC's claim because ADAC must establish that irreparable harm is real and

significant, not speculative and remote.[8]  *See Winter*, 555 U.S. at 22; *Goldie's Bookstore, Inc. v. Superior Court*, 739 F.2d 466, 472 (9th Cir. 1984) (speculative injury cannot be the basis for a finding of irreparable harm); *Caribbean Marine Servs. Co., Inc. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988) (mere "[s]peculative injury does not constitute irreparable injury sufficient to warrant granting a preliminary injunction").  In the absence of any evidence establishing that ADAC will incur harm that is "real" and "significant," ADAC's allegations of irreparable harm are purely speculative.  Thus, ADAC has not shown that it is likely to suffer irreparable injury in the absence of a preliminary injunction.  Nor has it shown the even higher level of injury required for a mandatory injunction.

**III.  THE DISTRICT COURT ACTED WELL WITHIN ITS DISCRETION IN FINDING THAT THE BALANCE OF EQUITIES AND PUBLIC INTEREST DO NOT FAVOR AN INJUNCTION.**

Plaintiffs assert that the balance of equities favors them because the ADOT Policy, among other things, "hinders [their] ability to work and to function as fully participating members of society." (Opening Br. at 62.)  As detailed above, the evidence in the record simply does not support this statement.  Uniformly, the Individual Plaintiffs are getting to work and school, and going about their daily

---

[8] Plaintiffs cite *Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 943 (9th Cir. 2011), in support of their argument that ADAC will suffer irreparable harm from the frustration of its organization's goals in the absence of a preliminary injunction.  (Opening Br. at 59.)  This case, however, dealt with organizational standing, not irreparable harm to an organization.

lives, without any serious impediment.  In fact, in the absence of a preliminary injunction, the Individual Plaintiffs generally plan to continue doing exactly what they are doing now.

Although Plaintiffs will not suffer any harm in the absence of a preliminary injunction, the hardships suffered by Defendants will be considerable if the Court grants a preliminary injunction.  Forcing Defendants to issue driver's licenses to DACA recipients pending a final resolution of this litigation could result in ADOT facing the administrative nightmare of later cancelling tens of thousands of driver's licenses if Defendants ultimately prevail.  Moreover, if DACA recipients obtain public benefits through the use of an Arizona driver's license, Arizona would face significant difficulties trying to cancel such benefits at a later time.  Defendants could also face liability should a driver's license be issued to, and later withdrawn from, a DACA recipient who causes an accident while driving with a license he/she should not have received.

Plaintiffs allege that any hardship imposed on Defendants would be minimal because Arizona previously issued driver's licenses to all deferred action recipients without distinction.  (Opening Br. at 63.)  Their analysis in this regard is faulty. The number of potential DACA recipients is far greater than the number of recipients of regular deferred action that have previously received driver's licenses. Over 14,000 people have already applied for DACA relief in Arizona.  Should the

Court force ADOT to issue driver's licenses to just these individuals, it would comprise close to 28 times the number of driver's licenses ADOT has previously issued to recipients of regular deferred action.[9]

Additionally, in Arizona, a driver's license is a form of primary documentation that can be used either alone or in conjunction with other documents to qualify for and access taxpayer-funded public benefits. *See* A.R.S. §§ 1-501(A), 1-502(A). Because state and federal law explicitly precludes illegal immigrants from obtaining state and federal public benefits, forcing ADOT to improperly issue driver's licenses would be in direct violation of state and federal public policy. *See, e.g.*, A.R.S. §§ 1-501, 1-502; Federal Welfare Reform Act, 8 U.S.C. § 1621. Issuing a preliminary injunction forcing state officials to act contrary to their own formulation of state policy does not support the public interest in the balance between state and federal power. *See, e.g.*, *City of Los Angeles v. Lyons*, 461 U.S. 95, 112 (1983) (federalism dictates that "in the absence of irreparable injury which is both great and immediate," injunctions should not be issued against state officials engaged in the administration of state law); *Rizzo v. Goode*, 423 U.S. 362, 378 (1976) (courts must be mindful of the "'special delicacy

---

[9] ADOT determined that it accepted 38,831 EADs as proof of authorized presence since 2005. The statistical analysis of the random sample revealed 1.3% of licenses in that sample were issued to regular deferred action. Extrapolating that, it is possible to estimate with reasonable statistical certainty that ADOT has issued 505 (1.3% of 38,831) driver's licenses to recipients of regular deferred action over the past seven years, since 2005. 14,000 is approximately 28 multiples of 505.

of the adjustment to be preserved between federal equitable power and State administration of its own law.'"). Thus, the balance of equities tips in Defendants' favor.

## IV.   PLAINTIFFS' CONFLICT PREEMPTION CLAIM FAILS AS A MATTER OF LAW BECAUSE THE ADOT POLICY DOES NOT CONFLICT WITH FEDERAL IMMIGRATION LAW.

Whether Plaintiffs are likely to succeed on their preemption claim is beside the point on this appeal from the district court's decision denying a preliminary injunction. Plaintiffs' claim for a preliminary injunction did not fail because the district court decided that they could not show a probability of success on the merits of their preemption claim. After dismissing the preemption claim, the district court went on to consider the claim for preliminary injunctive relief because it concluded that Plaintiffs had demonstrated a preliminary probability of success on their Equal Protection claim. The district court then denied the claim for a preliminary injunction because Plaintiffs had not established that they were irreparably harmed, that the balance of equities tips in their favor or that public policy favored the issuance of a preliminary injunction. Unless Plaintiffs can establish that the district court erred on all of these determinations, a determination that the district court erred in dismissing their preemption claim will not entitle them to an order reversing the denial of the preliminary injunction. Nevertheless, Defendants detail below why Plaintiffs' preemption claim fails as a matter of law.

**A.**    **ADOT Has Not Defined Authorized Presence in a Manner that Conflicts with Federal Law.**

The crux of Plaintiffs' preemption argument is that ADOT has defined "authorized presence" in a manner that conflicts with federal law. Plaintiffs are mistaken.

As an initial matter, the issue of whether DACA recipients have "authorized presence" in the United States is not even relevant to Plaintiffs' preemption analysis. At the evidentiary hearing, the court questioned the relevance of even having to make this determination. As the court opined to Plaintiffs' counsel:

> Why is the question of whether or not they're authorized to remain relevant in the case?
>
> . . . .
>
> [I]f Arizona disagrees with the federal government on whether or not they're authorized under federal law, that disagreement itself doesn't make their action invalid, right? You have to have some form of preemption in play before that disagreement makes the Arizona law invalid.

(SER 768-69.) As the district court correctly noted, whether DACA recipients have "authorized presence" under federal law is not the issue that needs to be decided to resolve Plaintiffs' preemption claim.

Regardless, the primary federal law regulating immigration, the INA, does not define the term "lawful" or "authorized" presence. Instead, the term is defined in the inverse. "Unlawful presence" relates to either: (1) the period of time an

alien is present in the United States after the expiration of the period of stay authorized by the DHS Secretary; or (2) the period of time an alien is present in the United States without being admitted or paroled. INA § 212(a)(9)(B)(ii), 8 U.S.C. § 1182(a)(9)(B)(ii). The accrual of unlawful presence is relevant only to determine whether an alien removed from the United States is barred from readmission to the United States for a three- versus a ten-year period. *See* INA § 212(a)(9)(B)(i)(I), 8 U.S.C. § 1182(a)(9)(B)(i)(I) (three-year bar); INA § 212(a)(9)(B)(i)(II), 8 U.S.C. § 1182(a)(9)(B)(i)(II) (ten-year bar).

Recognizing that the INA does not define "authorized" or "lawful" presence, Plaintiffs rely on other federal statutes, regulations, and court and BIA decisions in an attempt to demonstrate that a DACA recipient's "grant of deferred action is a federal grant of authorization to be present in the United States." (*See* Opening Br. at 21-22.) But Plaintiffs' contention is far too broad. Most of the authorities Plaintiffs rely upon do not specifically address DACA recipients. (*See* Opening Br. at 14-18.) And the only authority Plaintiffs cite that specifically addresses DACA recipients makes clear that, to any extent that deferred action confers "authorized" or "lawful" presence on DACA recipients, it is for the narrow purpose of stopping the accrual of unlawful presence used to calculate future bars to admissibility.

1.      **USCIS's Pronouncements Confirm that DACA Recipients Do Not Accrue Authorized Presence in the United States, Other than for the Calculation of Future Inadmissibility.**

Plaintiffs assert that USCIS "has confirmed that a DACA recipient, like any other deferred action grantee, is 'authorized by [DHS] to be present in the United States, and is therefore considered by DHS to be lawfully present during the period deferred action is in effect.'"   (Opening Br. at 18.)   Plaintiffs selectively quote from USCIS's published guidance and, as a result, mischaracterize that guidance.

In January 2013, USCIS updated its responses to the "Frequently Asked Questions" section of its website.  FAQ Number 6 states, in pertinent part:

> **Q6: If my case is deferred, am I in lawful status for the period of deferral?**
>
> A6: No.  Although action on your case has been deferred and you do not accrue unlawful presence (**for admissibility purposes**) during the period of deferred action, deferred action does not confer any lawful status.
>
> The fact that you are not accruing unlawful presence does not change whether you are in lawful status while you remain in the United States.  However, although deferred action does not confer a lawful immigration status, your period of stay is authorized by the Department of Homeland Security, while your deferred action is in effect and, **for admissibility purposes**, you are considered to be lawfully present in the United States during that time.

(ER 366.) (Emphasis added.)   The plain language of FAQ #6 demonstrates that, even if a DACA recipient had "authorized" or "lawful" presence, it would only be for the purpose of stopping the accrual of unlawful presence used to calculate

45

future bars to admissibility.[10]  Plaintiffs' experts confirmed this interpretation of the FAQs during their depositions (SER 853-58, 871-73), and Defendants' expert concurred in his rebuttal declaration and expert report.  (SER 845.)

The published response to FAQ #6 continues:

> Apart from the immigration laws, "lawful presence", "lawful status" and similar terms are used in various other federal and state laws.  **For information on how those laws affect individuals who receive a favorable exercise of prosecutorial discretion under DACA, please contact the appropriate federal, state or local authorities.**

(ER 366-67.) (Emphasis added.) Thus, FAQ #6 demonstrates that, despite USCIS's internal position that deferred action confers "authorized" or "lawful" presence for the narrow purpose of stopping the accrual of unlawful presence for calculating future bars to admissibility, it does not define how those terms affect, if at all, similar terms in other contexts. This, too, was confirmed by Plaintiffs' experts during their depositions.[11]  (SER 863-65, 873.)

---

[10] The statement in the FAQ responses that the recipient's "period of stay" is authorized by DHS appears to assert a position inconsistent with what USCIS previously had stated regarding whether deferred action gave "authorized" or "lawful" presence.  USCIS's Adjudicator's Field Manual states that the fact that a DACA recipient does not accrue unlawful presence for purposes of future bars to admissibility <u>does not mean that person's presence is actually lawful</u>.  (SER 785.)

[11] As noted in Part III of the Statement of Facts, *supra*, the Department of Health and Human Services has explicitly carved out DACA recipients from the definition of "lawful presence" for certain benefits under the Affordable Care Act.

2.    **A Congressional Research Service Memorandum Confirms That, Notwithstanding Any Authorized Presence For Admissibility Purposes, DACA Recipients Are Otherwise Unlawfully Present and Not Authorized to Reside in the United States.**

Legislative attorneys and immigration policy specialists prepared a Congressional Research Service Memorandum ("Congressional Report"), which analyzed the DACA Program, for distribution to multiple congressional requesters. In a section entitled, "Corollary Policy Implications: Access to Federal Benefits," the Congressional Report states:

> Many observers characterize foreign nationals with relief from removal who obtain temporary work authorizations as "quasi-legal" unauthorized migrants. They may be considered "lawfully present" for some very narrow purposes under the INA (such as whether time in deferred action counts as illegal presence under the grounds of inadmissibility) **but are otherwise unlawfully present.**

(ER 441.) (Emphasis added.) A corresponding footnote provides, in pertinent part: "These are circumstances in which DHS issues temporary employment authorization documents (EADs) to aliens who are not otherwise considered authorized to reside in the United States." The section concludes: "Thus, beneficiaries of the June 15, 2012 policy directive will be among those 'quasi-legal' unauthorized migrants who have EADs and SSNs—**but who are not otherwise authorized to reside in the United States."** (ER 442.) (Emphasis added.)

The immigration policy experts that briefed Congress, DHS, USCIS, Plaintiffs' experts, and Defendants' expert all agree: Even if deferred action conveys "lawful" or "authorized" presence for purposes of calculating the length of a future bar to admissibility, the DACA Program does not provide authorized presence for any other purpose.   For that reason, Defendants could separately and validly determine DACA recipients do not have authorized or lawful presence for purposes of Arizona's driver's license statute, without running afoul of any federal immigration laws.   The cases relied upon by Plaintiffs—*Toll, Merten,* and *Bentley*—are inapposite.   Put simply, Defendants have not redefined "authorized presence" in conflict with federal law.

## B.   The ADOT Policy Does Not Conflict with Congress and Federal Law.

Plaintiffs' assertion that the ADOT Policy conflicts with Congress's delegation of authority to the Executive rests on a fundamental misunderstanding of the policy itself.   Plaintiffs assert that Arizona has decided whether a noncitizen is authorized to remain in the United States. (Opening Br. at 24-29.)   That simply is not true.   Neither the Executive Order nor the ADOT Policy determines whether DACA recipients can remain in Arizona.   Instead, Defendants have determined that DACA recipients' EADs are insufficient to establish their presence is authorized under federal law for purposes of Arizona's driver's license statute.

Thus, Plaintiffs' reliance on *Arizona v. United States,* 132 S. Ct. 2492 (2012), and *United States v. Alabama*, 691 F.3d 1269 (11th Cir. 2012), is wholly misplaced.

In *Arizona*, the Supreme Court struck down an Arizona statute that authorized state officers to make arrests based on a state determination that a noncitizen is removable. 132 S. Ct. at 2503-07. Likewise, in *Alabama*, the Eleventh Circuit struck down an Alabama statute that prohibited courts from enforcing contracts between a party and an unlawfully present alien. 691 F.3d at 1295. The court concluded that "Alabama has crafted a calculated policy of expulsion, seeking to make the lives of unlawfully present aliens so difficult as to force them to retreat from the state." *Id.* at 1294. Accordingly, the court concluded the statute conflicted with "Congress's comprehensive statutory framework governing alien removal." *Id.*

Here, Defendants have not precluded DACA recipients from remaining in Arizona. Nor have they made any decision to remove DACA recipients from Arizona. Instead, the ADOT Policy simply applies the Arizona statute to determine that DACA recipients are not entitled to driver's licenses. Accordingly, neither the ADOT Policy nor the Executive Order conflicts with Congress's decision to delegate to the Executive the discretion to administer and enforce the INA.

### C.   **The ADOT Policy Does Not Undermine the Federal Government's Determination that DACA Recipients Be Permitted to Work.**

There is no dispute regarding the purpose of the DACA Program.  In fact, the parties agree that the purpose of the DACA Program is to ensure that DHS's enforcement resources are not expended on low priority cases, but are focused instead on higher priority cases.  (ER 203.)  Plaintiffs nonetheless make a tenuous argument that the ADOT Policy undermines the Congress's intention that "the federal Executive [] determine which noncitizens should be permitted to work." (Opening Br. at 30.)

Plaintiffs' tenuous argument, however, cannot meet the "high threshold [that] must be met if a state law is to be preempted for conflicting with the purposes of a federal Act."  *Chamber of Commerce of U.S. v. Whiting*, 131 S. Ct. 1968, 1985 (2011) (quoting *Gade v. Nat'l Solid Waste Mgmt. Ass'n*, 505 U.S. 88, 110 (1992)); *see also Incalza v. Fendi N. Am., Inc.*, 479 F.3d 1005, 1009 (9th Cir. 2007) ("Tension between federal and state law is not enough to establish conflict preemption."); *Ariz. Contractors Ass'n, Inc. v. Napolitano*, Nos. CV07-1355, CV07-1684, 2007 WL 4570303, at *8 (D. Ariz. Dec. 21, 2007) ("A mere difference between state and federal law is not conflict.").  In fact, a state law is generally only an impermissible "obstacle" to the "purposes and objectives" of a federal law "[i]f the purpose of the act cannot otherwise be accomplished[,] if its

operation within its chosen field else must be frustrated[,] and its provisions be refused their natural effect . . . ." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000) (quoting *Savage v. Jones*, 225 U.S. 501, 533 (1912)).

Neither the ADOT Policy nor the Executive Order makes any determination as to who may work. Further, even if Plaintiffs could show that Congress intended that DACA recipients work (it cannot),[12] or that ability to work was one of the objectives Congress had in mind when it delegated immigration administration and enforcement to DHS (it cannot), the denial of a single form of transportation is not an "obstacle" to these intentions. *Cf. Miller v. Reed*, 176 F.3d 1202, 1205-06 (9th Cir. 1999) (finding that burdens on a single mode of transportation do not rise to the level of a violation of a constitutional right); *Monarch Travel Servs., Inc. v. Associated Cultural Clubs, Inc.*, 466 F.2d 552, 554 (9th Cir. 1972) ("A rich man can choose to drive a limousine; a poor man may have to walk. The poor man's lack of choice in his mode of travel may be unfortunate, but it is not unconstitutional."). There is no legal basis for the Court to take the extraordinary

---

[12] The intentions of the DACA Program cannot be imputed to Congress because Congress repeatedly has refused to enact legislation that would accomplish the goals of the DACA Program. *See, e.g.,* DREAM Act of 2011, S. 952, H.R. 1842, 112th Cong. (2011).

step of finding conflict preemption based on a conflict between the ADOT Policy and a congressional intent to permit work.[13]

In short, Plaintiffs have identified no congressional intent that is frustrated by Arizona's driver's license policy. As the district court properly noted, "[Plaintiffs] certainly have not identified the kinds of conflicts that have led the Supreme Court to find conflict preemption in cases such as *Arizona*, 132 S. Ct. at 2503-07, and *Toll*, 458 U.S. at 12-15." (ER 13.) Accordingly, the district court properly concluded that Plaintiffs cannot succeed on the merits of their conflict preemption claim.

## V. PLAINTIFFS' CONSTITUTIONAL PREEMPTION CLAIM FAILS BECAUSE THE ADOT POLICY NEITHER REGULATES IMMIGRATION NOR CREATES IMMIGRATION CLASSIFICATIONS.

Plaintiffs assert that the ADOT Policy is constitutionally preempted because "Arizona has created its own classification of DACA recipients and, in so doing, has intruded on the federal government's exclusive constitutional power to regulate immigration." (Opening Br. at 32.) Plaintiffs' assertion, however, has no basis in law. The U.S. Supreme Court recently and clearly reaffirmed the three traditional categories of preemption—express, field, and conflict. *See Arizona*, 132 S. Ct. at 2500-01. "Constitutional" preemption is not one of the three categories, and the

---

[13] Indeed, the record in this case belies any such conflict since it is clear that Plaintiffs are not precluded from obtaining jobs or going to and from work by their lack of a driver's license. *See supra* Part II.B of the Argument section.

cases relied upon by Plaintiffs do not support their constitutional preemption theory.

Relying on *De Canas* and *Lopez-Valenzuela*, Plaintiffs suggest that any state law touching on immigration is constitutionally preempted. (Opening Br. at 33.) *De Canas* and *Lopez-Valenzuela*, however, do not stand for this broad proposition and both cases, in fact, made no finding of constitutional preemption. *De Canas v. Bica* involved a challenge to a California law that prohibited employers from knowingly employing "an alien who is not entitled to lawful residence in the United States if such employment would have an adverse effect on lawful resident workers." 424 U.S. 351, 352 (1976). The Supreme Court declined to invalidate the law on preemption grounds, finding:

> Power to regulate immigration is unquestionably exclusively a federal power. But the Court has never held that every state enactment which in any way deals with aliens is a regulation of immigration and thus per se pre-empted by this constitutional power, whether latent or exercised. . . . *[T]he fact that aliens are the subject of a state statute does not render it a regulation of immigration, which is essentially a determination of who should or should not be admitted into the country, and the conditions under which a legal entrant may remain*.

*Id.* at 354-55 (internal quotation marks and citations omitted) (emphasis added). The Supreme Court added that "even if such local regulation has some purely speculative and indirect impact on immigration, it does not thereby become a

constitutionally proscribed regulation of immigration that Congress itself would be powerless to authorize or approve." *Id.* at 355-56.

Similarly, in *Lopez-Valenzuela v. Cnty. of Maricopa*, 719 F.3d 1054 (9th Cir. 2013) the Court made no finding of constitutional preemption. Instead, the Court concluded:

> Were the Proposition 100 laws actual regulations of immigration—that is, were they to actually function as a determination of who should or should not be admitted or allowed to remain in the United States—they would be preempted. But, standing alone, the fact that aliens are the subject of a state statute does not render it a regulation of immigration . . . . The Proposition 100 laws neither determine who should be admitted to the United States nor prescribe conditions under which legal entrants may remain. Rather, those who are subject to detention under the Proposition 100 laws are being detained because of the crime they are accused of committing. Arizona state officials are not directly facilitating immigration removals and their immigration status decisions for the purposes of Proposition 100 are not binding in subsequent proceedings within the federal immigration system.

*Id.* at 1070 (internal citation omitted).[14]

---

[14] Plaintiffs also rely on several district court decisions to support their constitutional preemption argument. As the district court correctly noted, these decisions contradict the holding of *De Canas*. The court in *League of United Latin American Citizens v. Wilson*, 908 F. Supp. 755, 768 (C.D. Cal. 1995), held that any state law requiring state officials to classify aliens independent of federal law constitutes a regulation of immigration and is preempted under the holding of *De Canas*. *Id.* at 770. But *De Canas* did not adopt this rule. Instead, *De Canas* held that the Constitution does *not* preempt all state statutes or regulations that affect illegal immigrants and which treat them differently from others, including other

Thus, as the district court noted, Plaintiffs' constitutional preemption argument is "legally incorrect."   (ER 8, 11, 40.)   But, even if Plaintiffs' constitutional preemption argument were supported by relevant Supreme Court cases, the ADOT Policy and the Executive Order are not regulations of immigration.  The ADOT Policy and the Executive Order, like the laws at issue in *De Canas* and *Lopez-Valenzuela*, do not determine who should be admitted into the country or who can remain here.  Instead, they simply apply the Arizona statute to determine that Plaintiffs are not entitled to driver's licenses.  Accordingly, they do not regulate immigration.

The Executive Order and ADOT Policy do not create classifications of immigration status different than those the INA created.   Plaintiffs refer to a number of cases where they claim courts "have held preempted state attempts to create their own immigration classifications because they were impermissible regulations of immigration." (Opening Br. at 37-38.)  All of the cases Plaintiffs cite are inapplicable for a key reason.  In each, the court determined that a state law was preempted because the law required or allowed states to make immigration classifications that stood in direct conflict with formal immigration statuses and classifications that the INA expressly created.  That is not the case here.

---

immigrants.  424 U.S. at 355.  The other district court decisions cited by Plaintiffs each adopt the incorrect *Wilson* reading of *De Canas*.  *See Equal Access Educ. v. Merten*, 305 F. Supp. 2d 585 (E.D. Va. 2004); *Hispanic Interest Coal. of Ala. v. Bentley*, No. 5:11-CV-2482-SLB, 2011WL 5516953 (N.D. Ala. Sept. 28, 2011).

The DACA Program does not change a DACA recipient's substantive legal immigration status. There is no dispute that the immigration status of DACA grantees continues to be unlawful under the provisions of the INA. In fact, during their depositions, Plaintiffs' immigration law experts confirmed that: (1) the DACA Program is merely a policy decision not to enforce federal law against someone (SER 860, 869-70); (2) prosecutorial discretion does not bestow any benefit on an individual (SER 860-61); and (3) DACA recipients remain subject to removal (*i.e.*, are deportable) under the INA even while under deferred action (SER 862, 866, 868). Plaintiffs' status under the INA has not changed as a result of the ADOT Policy or Executive Order.

Just as the California statute in *De Canas* and the Arizona statute in *Lopez-Valenzuela*, the Executive Order and the ADOT Policy do not make a determination as to alien status. Instead, the Executive Order expressly adopts the classifications of the DACA Program. Based on the federal administrative classification of DACA recipients as illegal aliens who have been granted a temporary reprieve from deportation, the ADOT Policy and the Executive Order simply clarify Arizona's position precluding DACA recipients from using EADs to obtain driver's licenses or state identification.

Importantly, when a state law incorporates immigration classifications adopted by the federal government, courts are extremely cautious in concluding

that the state law is preempted. The case of *John Doe No. 1 v. Georgia Department of Public Safety*, 147 F. Supp. 2d 1369 (N.D. Ga. 2001), is persuasive. There, the State of Georgia passed a law, regarding driver's licenses, that "no person shall be considered a resident for purposes of this chapter unless such person is either a United States citizen or an alien with legal authorization from the U.S. Immigration and Naturalization Service." *Id.* at 1372 (citing O.C.G.A. § 40-5-15(15)). The plaintiff presented the exact same argument as Plaintiffs do here— namely that the Georgia statute was preempted as an impermissible regulation of immigration. *Id.* at 1375. The court, citing to *De Canas*, held that "Plaintiff's argument that the Georgia driver's license statute is a substantial burden upon national immigration policy is totally without merit. The Georgia statutes mirror federal objectives by denying Georgia driver's licenses to those who are in this country illegally according to federal law." *Id.* at 1376. Accordingly, like the state statute at issue in *John Doe*, the Executive Order and ADOT Policy are not preempted.

## CONCLUSION

The Court should affirm the district court's order denying the preliminary injunction. The district court correctly applied the heightened standard of proof required for mandatory injunctions and found that Plaintiffs have not established the likelihood of irreparable harm in the absence of a preliminary injunction.

Further, the district court properly concluded that, based on Plaintiffs' failure to show the likelihood of irreparable harm because they drive or have driven, the balance of equities does not tip in their favor.   Even if the district court had not applied a heightened standard of proof, Plaintiffs still would have been unable to establish any entitlement to a preliminary injunction.   Finally, the district court properly rejected Plaintiffs' preemption claim, finding that neither the Executive Order nor the ADOT Policy conflicts with federal immigration law or are preempted on constitutional grounds.

RESPECTFULLY SUBMITTED:  August 12, 2013.

FENNEMORE CRAIG, P.C.

By *s/ Douglas C. Northup*
Douglas C. Northup
Timothy Berg
Sean T. Hood
Attorneys for Defendants-Appellees
Governor Janice K. Brewer, John S.
Halikowski and Stacey K. Stanton

- and -

Joseph Sciarrotta, Jr.
Office of Governor Janice K. Brewer
Co-Counsel for Defendant-Appellee
Governor Janice K. Brewer

## STATEMENT OF RELATED CASES

Pursuant to Circuit Rule 28-2.6, Defendants state that they are unaware of any pending cases in this Court related to this one.

RESPECTFULLY SUBMITTED:  August 12, 2013.


*s/ Douglas C. Northup*
Attorney for Defendants-Appellees
Governor Janice K. Brewer, John S.
Halikowski and Stacey K. Stanton

## CERTIFICATE OF COMPLIANCE

I certify that, pursuant to Rule 32(a)(7)(c), Fed. R. App. P., and Circuit Rule 32-1, the foregoing Answering Brief is proportionately spaced, has a typeface of 14 points or more and contains 13,718 words (according to the Microsoft Word word count function).

RESPECTFULLY SUBMITTED:  August 12, 2013.


_s/ Douglas C. Northup_
Attorney for Defendants-Appellees
Governor Janice K. Brewer, John S.
Halikowski and Stacey K. Stanton

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing Answering Brief with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on August 12, 2013.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

*s/ Douglas C. Northup*
Attorney for Appellees
Governor Janice K. Brewer, John S.
Halikowski and Stacey K. Stanton